IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| DANTE A.R. COMBS, individually and on behalf of all others similarly situated, and ADAM S. WILLIAMS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE CORDISH COMPANIES, INC., et al.,<br><br>Defendants. | Case No. 14-0227-CV-W-ODS |

ORDER AND OPINION DENYING
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Pending is Plaintiffs' Motion for Class Certification. Defendants Cordish Companies, Lounge KC, Entertainment Concepts Investors, and Entertainment Consulting International (collectively "Cordish") filed Suggestions in Opposition. Defendant First Response filed separate Suggestions in Opposition that incorporates Cordish's arguments and presents some arguments focusing on First Response. The Court has considered all of the parties' arguments and materials, and now denies the motion (Doc. # 83).

I. BACKGROUND

The Amended Complaint raises allegations about activities in "the Power and Light District" ("the District") – "an approximately eight-block neighborhood located in downtown Kansas City" that consists of "a number of restaurants, bars, clubs, and other entertainment venues . . . ." Amended Complaint, ¶¶ 12-13. Plaintiffs allege each business in the District is "ultimately controlled, directly or indirectly, by" Cordish. Plaintiff's Suggestions in Support (Doc. # 84) at 6. First Response is generally

described as an entity retained to provide security in the District. Beyond these allegations, the Defendants' roles or connections to the District are not clearly described.

Within the District is a common area referred to as the "Living Room" or "Plaza," consisting of a patio area and the entrances (in some cases, the only entrances) to various bars, restaurants and nightclubs. Amended Complaint, ¶¶ 16-17. The Amended Complaint generally alleges Defendants have taken measures to preclude African Americans from being in the Plaza, thereby denying them access to the businesses accessed therefrom. Specifically, Defendants are alleged to have limited African Americans' access to the District through use of the following means:

- Delayed or outright denial of entry, Id., ¶¶ 32-33,
- Harassing and provoking patrons through the use of "excessive questioning," following patrons, and making "unfounded accusations" about violations of the dress code or the District's rules of conduct, Id., ¶¶ 34-36, and
- The use of one or more employees (termed "rabbits") to initiate altercations with African Americans in order to fabricate an excuse to eject them. Id., ¶ 42-48.

The Amended Complaint identifies three specific instances in which these tactics were employed: two involve Combs, and one involves both Combs and Williams. Id., ¶¶ 49-90. In the first incident, Combs alleges a Caucasian male bumped into him and knocked his cell phone to the ground, then "aggressively got in Plaintiff Combs' face and said words to the effect of 'What are you looking at?'" Security guards arrived and made Combs leave, but did not make the person who bumped into him leave. Amended Complaint ¶¶ 51-55, 57-58. In the second incident, Combs attempted to enter the Mosaic Lounge. Four or five Caucasians were admitted into the club without problem, but he was stopped and required to produce identification. Once he did, he was put into a different line, at which time he was ignored. His requests to see the manager were also ignored. He was eventually told that his pants were "too baggy" even though he was "professionally dressed in a tailor-made upscale suit, tie, and shoes." Combs continued to insist upon receiving the names of the persons refusing

2

him admittance, at which point he was ejected. Amended Complaint, ¶¶ 61-72. In the third incident, Combs and Williams were at a restaurant in the District when a male Caucasian approached them and started a scuffle. The scuffle was joined by more Caucasian men. Despite being told that neither Combs nor Williams started the incident, security guards from First Response handcuffed Williams, removed him from the premises, held him for ninety minutes, and subjected him "to harassing questions about what he was doing at [the District] and how often he came there." After ninety minutes, Williams was released. Amended Complaint, ¶¶ 78-90.

Plaintiffs seek to assert actions on behalf of a class. The only remaining claim appears in Count II,[1] which is based on 42 U.S.C. § 1981. This statute provides that all persons "shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." Plaintiffs propose a class consisting of all persons of African American descent who were "excluded, ejected, harassed, or suffered other discriminatory treatment" by Defendants within the District at any time after March 10, 2010.

## II. DISCUSSION

Certification of a class action is governed by Rule 23 of the Rules of Civil Procedure. A district court retains discretion to certify a class if (1) all of the requirements of Rule 23(a) are satisfied and (2) the class qualifies under one of the three categories in Rule 23(b). The district court must conduct a "rigorous analysis," which does not permit the Court to resolve the merits but requires the Court to "consider[ ] . . . what the parties must prove." Elizabeth M. V. Montenez, 458 F.3d 779, 786 (8th Cir. 2006). The district court must also probe behind the pleadings – again, not to resolve the merits, but to understand the facts that will be utilized to support the claims asserted. E.g., Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551-52 (2011);

---

[1] Count I, which was premised on Title II of the Civil Rights Act, was dismissed on August 26, 2014.

3

Bennett v. Nucor Corp., 656 F.3d 802, 814 (8th Cir. 2011), cert. denied, 132 S. Ct. 1807 (2012).

In conducting this analysis it is helpful to consider the law governing section 1981 claims. Plaintiffs cite cases discussing section 1981 claims based on circumstantial evidence, and for the sake of argument the Court will accept that Plaintiffs present a case based on circumstantial (and not direct) evidence of discrimination. With that understanding, Plaintiffs must establish a prima facie case of discrimination establishing (1) they are a member of a racial minority, (2) one or more Defendants intended to discriminate against them based on their race, and (3) the discrimination concerned an area described in the statute. Williams v. Lindenwood Univ., 288 F.3d 349, 355 (8th Cir. 2002). The first and third components are not really at issue; there is no question that Plaintiffs and the class are members of a racial minority, and there is no question that the alleged discrimination concerns an area described in the statute.[2] The second component implies (and *Williams*'s ensuing discussion confirms) that the Plaintiffs must present evidence demonstrating that they were somehow treated differently based on their race (because merely having an intent to discriminate, alone, does not create the cause of action). Id. at 355-56. Once the prima facie case has been satisfied, the

---

[2] Cordish discusses at length the need for there to be an identified contractual relationship that has been impaired. Cf. Withers v. Dick's Sporting Goods, Inc., 636 F.3d 958, 963 (8th Cir. 2011). For present purposes – and until Cordish demonstrates otherwise – the Court accepts that the attempt to enter a retail establishment for the purpose of buying food and drink qualifies as a contractual relationship, and that denying entry into the premises based on the customer's race would impair the making of that contract. The Court is also of the view that an attempt to pay a cover charge to gain entry into a retail establishment (if one is required) would also qualify as a contractual relationship. To the extent that Cordish intimates that Plaintiffs' or the class members' contractual relationships somehow "ended" upon the completion of a purchase, the Court notes that the making and enforcing of contracts within the statute's meaning "includes the making, performance . . . and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The Court is presently of the view that one of the "terms and conditions" of a contract in which a person buys food or drink in a restaurant or bar is the consumption of the food or drink in the premises. The Court is also of the view that one of the terms and conditions of a contract whereby a patron pays a cover charge is to stay in the premises until the patron wants to leave or the contract expires on its own terms.

4

Defendant is entitled to rebut the presumption of discrimination by presenting evidence demonstrating a legitimate, nondiscriminatory reason for its actions.

## A. Rule 23(a) and the Class Definition

To be certified, a class must satisfy the requirements of Rule 23(a). Those requirements are:

1) The class is so numerous that joinder of all members is impracticable;
2) There are questions of law or fact common to the class;
3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
4) The representative parties will fairly and adequately protect the interests of the class.

In addition, either before or as part of the Rule 23(a) analysis, the Court must examine the proposed class definition to determine if it is sufficiently precise. "[T]he definition should be sufficiently precise, standing alone, to afford the court and parties the ability to ascertain who is a class member. . . . Class definitions inform the court, all named parties, and the class members concerning the scope of putative members entitled to notice of the proceedings, who can ultimately enforce a favorable ruling, and who will be bound by an adverse one." Carson P. ex rel. Foreman v. Heineman, 240 F.R.D. 456, 495 (D. Neb. 2007); see also In re Constar Int'l Inc. Securities Litig., 585 F.3d 774, 782 (3d Cir. 2009); In re Monumental Life Ins. Co., 365 F.3d 4908, 413 (5th Cir. 2004); Manual for Complex Litigation (Fourth) § 21.222.

Plaintiffs' proposed class definition is too ambiguous. The class is defined in terms of people who were "excluded, ejected, harassed, or suffered other discriminatory treatment." Context suggests the class is actually limited to those who were ejected based on their race or excluded based on their race – because African Americans who were ejected for non-racial reasons have no claim under section 1981. It cannot be Plaintiffs' intent to suggest that the jury or Court must automatically conclude that all ejections or exclusions were based on race. Thus, the class definition has to be modified to reflect this facet of the claims. Second, the generalized phrase "or suffered

5

other discriminatory treatment" is too broad to be of any use in identifying the nature of the claims asserted. Again, the class definition has to be modified to reflect the claims asserted. The Court is not bound by the parties' proposed class definition(s). E.g., Smith v. Brown & Williamson Tobacco Corp., 174 F.R.D. 90, 92 n.2 (W.D. Mo. 1997). The problems identified can be alleviated (at least in part)[3] by changing the class definition to

> All persons of African American descent who, while in or attempting to
> enter the District at any time after March 10, 2010,
> 1. were excluded based on their race,
> 2. ejected based on their race, or
> 3. harassed based on their race through the use of excessive
> questions, being followed, or subjected to unfounded accusations of
> violations of District rules (including dress codes).

This definition encompasses the specific activities alleged in paragraphs 32-48 of the Amended Complaint. In particular, the claims of delayed or denied entry are included in #1, the harassment claims are included in #3, and the alleged use of "rabbits" to pick fights with customers and provide an excuse to eject them is a subset of #2. Patrons who allege to have been ejected based on race without the use of a rabbit would also fall within #2. Presumably, subclasses could be created based on these three categories of claims with some people (such as Combs) being members of multiple subclasses.

---

[3] It may be that the Court's modified class definition is still insufficient. For instance, some circuits have held that a "fail-safe class" – one in which a person's membership depends on them first having a valid claim – is impermissible. E.g., Messner v. Northshore Univ. HealthSystem, 689 F.3d 802 (7th Cir. 2012). Other circuits have rejected this view. E.g., In re Rodriguez, 695 F.3d 360, 370-71 (5th Cir. 2012). The Eighth Circuit has not addressed the issue. The Court tends to agree with the Fifth Circuit's view; although fail-safe classes sometimes present significant issues with respect to Rule 23(b)(3)'s predominance requirement, they are usually less problematic for classes under Rule 23(b)(1) and (b)(2) and nothing in Rule 23 prohibits them. However, the Court will not delve further into this issue for a variety of reasons, the most important of which is this: given that the class is not being certified on other grounds, there is no reason to exert greater effort on the issue.

The Court will spend little time on the Rule 23(a) requirements of numerosity and adequacy. Plaintiffs contend there are at least 5,000 class members. Defendants dispute this conclusion, contending that Plaintiffs have no proof that 5,000 people have been subjected to the conduct necessary to make them members of the class. Plaintiffs' number is based on an estimate on the number of African Americans who have patronized the District within the relevant time period. For the sake of argument, the Court will accept Plaintiffs' calculation and the premise that there are potentially 5,000 class members. As for adequacy, the Court's discussion of other issues makes it unnecessary to examine the adequacy of either the would-be class representatives or class counsel. The Court specifically cautions that nothing herein should be construed as an opinion regarding the ability of counsel to adequately represent the class.

The commonality requirement is barely satisfied, if at all. Plaintiffs correctly contend that there is no need for every question of law and fact to be common to all class members, and suggest that the following common questions exist: (1) whether Defendants had policies or practices that denied African Americans the right to make contracts in the District and (2) whether such policies were actually employed with the intent of denying African Americans the rights to make such contracts or to otherwise limit the number of African Americans in the District. These questions are common in a broad and abstract sense. But, as the Supreme Court has counseled, any competently crafted class complaint will raise questions that appear common. Dukes, 131 S. Ct. at 2551. The Supreme Court explained that a question is properly regarded as common to all class members if it produces common answers that are capable of promoting resolution of the litigation. Id. at 2555; see also Smith, 174 F.R.D. at 94 (noting that resolution of the supposedly common issues must advance resolution of the individual cases). Convincing a jury that Defendants have such policies does not mean that any particular Plaintiff or class member is entitled to relief; to get relief, each Plaintiff and class member must demonstrate that the policy was actually employed in whatever situation(s) they were involved in. For instance, proving that Defendants had a practice of employing "rabbits" to pick fights with African Americans in order to fabricate an excuse to evict such patrons will not resolve whether any particular ejected individual

7

was properly or improperly ejected – so the answer to the common question does little to advance any particular person's legal claim.

The situation is similar to the one confronted by the Supreme Court in Dukes and before that in General Telephone Co. of the SW v. Falcon, 457 U.S. 147 (1982). The Court recognized that there is a difference between (1) an individual's claim that he or she has been subjected to discrimination and (2) "the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim will share common questions of law or fact and the individual's claim will be typical of the class claims." Falcon, 457 U.S. at 157-58. There are two means of bridging the gap. The first – utilization of a biased testing procedure or other discrete and universally applicable method or standard – is not applicable in this case because there is no universal method or standard alleged. The second method requires "significant proof" that Defendants operated under a general policy of discrimination. Dukes, 131 S. Ct. at 2553. Plaintiffs have not presented significant proof – at best, they have presented proof that Defendants sometimes employed the practices they have identified. The problem is that – like the plaintiffs in Dukes – they have no evidence demonstrating the extent to which these practices were actually employed. Cf. Dukes, 131 S. Ct. at 2553-54 (plaintiffs' evidence did not establish with specificity how regularly stereotypes and a policy of discretionary decision combined to play a meaningful role in defendant's employment decisions). Absent evidence as to the frequency with which the discriminatory practices were employed, Plaintiffs are unable to demonstrate the degree of commonality necessary to bridge the gap between their individual situations and a common question with a common answer. Cf. id. at 2554-55.

Even if commonality were satisfied, Plaintiffs' proposed class presents a problem with typicality. Typicality and commonality are related concepts (and both are related to adequacy). Falcon, 457 U.S. at 157-58. "Typicality . . . requires a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff." Tate v. Weyerhaeuser Co., 723 F.2d 598, 608 (8th Cir. 1983), cert. denied, 469 U.S. 847 (1984) (quotation omitted). Combs and Williams have presented allegations that, if believed by the jury, might persuade the jury that they were ejected from the District based on their race. However, neither Combs nor Williams have

presented any evidence that the individuals who started the confrontations culminating in their ejection were the so-called "rabbits" to which they have repeatedly referred. Thus, their claims of discriminatory ejection are not typical of all class members' claims. Moreover, neither Combs nor Williams present a claim of harassment: Combs alleges he was denied entry, and both Combs and Williams allege they were ejected, but neither presents a claim of harassment falling short of ejection or barred entry. Thus, their claims are not typical of those class members who claim harassment that did not involve ejection or denial of entry.[4]

### B. Rule 23(b)(3)

Even if the issues discussed above could be obviated, Plaintiffs' proposal presents insurmountable problems that preclude qualification under Rule 23(b). As stated earlier, a would-be class must satisfy the requirements of Rule 23(a) and qualify under one of the categories under Rule 23(b). Plaintiffs suggest their proposed class satisfies Rule 23(b)(3); the Court holds otherwise.

Rule 23(b)(3) requires
1) the common questions of law and fact found to exist under Rule 23(a)(2) "predominate over any questions affecting only individual members," and
2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

The rule then sets forth factors to be considered in evaluating these two matters; as related to this case, the most significant factor is the "likely difficulties in managing a class action." Rule 23(b)(3)(D).

### *1. Predominance*

The common questions – assuming they are common within the meaning of Rule 23(a)(2) – do not predominate over the individual questions. The mere presence of

---

[4]These observations also suggest difficulties with Plaintiffs' ability to adequately represent the class, but there is no need to discuss this issue further.

9

Case 4:14-cv-00227-ODS   Document 121   Filed 02/03/15   Page 9 of 13

individual issues does not automatically destroy predominance; the Court must compare the common questions to the individual questions to determine if the latter predominate over the latter. E.g., Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 815–16 (7th Cir. 2012); Beattie v. CenturyTel, Inc., 511 F.3d 554, 564 (6th Cir. 2007), cert. denied, 555 U.S. 1032 (2008); Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32, 40 (1st Cir. 2003); Bertulli v. Independent Ass'n of Continental Pilots, 242 F.3d 290, 298 (5th Cir. 2001). In conducting this comparison, the Court must focus particularly on "whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member." Halvorson v. Auto-Owners Ins. Co., 718 F.3d 773, 778 (8th Cir. 2013). In addition, "the need for detailed and individual factual inquiries concerning the appropriate remedy for any violation still weighs strongly against class certification." In re St. Jude Med., Inc., 522 F.3d 836, 840 (8th Cir. 2008).

Plaintiffs' arguments presume that merely proving one or more Defendants intended to discriminate means each class member will prevail. This is incorrect. Each class member must prove they were actually the victim of such discrimination. For instance, with respect to the claim involving rabbits: it is not enough for Plaintiffs to convince a jury that Defendants employed "rabbits" to pick fights in order to manufacture an excuse to eject a customer – each class member must prove that this is actually what happened to him or her. This requires an individualized examination of the circumstances surrounding each and every ejection. It may be that some were ejected for discriminatory reasons while others were ejected for legitimate, nondiscriminatory reasons. Only those who were ejected for discriminatory reasons are entitled to a recovery. Significantly, Defendants are entitled to "individualized determinations" of each class member's eligibility to recover monetary damages; absent such an individualized determination, there is no basis for awarding relief. Dukes, 131 S. Ct. at 2560-61.

Conceptually, the common issues are dwarfed by the individual issues. This is true as a practical matter as well. Individualized testimony about each person's ejection, harassment, or denied entry will be required. Plaintiffs recognize that each of the 5,000 class members may have to testify and estimate they can relate their individual circumstances in one or two hours each. Plaintiffs' Suggestions in Support at

10

23. Assuming that this is accurate, and further assuming the low end of Plaintiffs' estimate, this would require 5,000 hours of trial testimony – or, 625 trial days. In truth, however, Plaintiffs' estimation is woefully inadequate. It is doubtful that each class member's testimony (including cross-examination and redirect) will only be one hour. It is also doubtful that each class member will be content with offering only their own testimony to support their version of events; for instance, Williams will probably want Combs to testify about the events surrounding his ejection. And, most importantly, Defendants are entitled to bring their own witnesses to describe the events in question. This means that for each class member, there will be multiple witnesses: the claimant, any witnesses the claimant wishes to offer to support his/her version of events, and any witnesses the Defendants wish to present to counter this testimony. Certification would essentially require a separate trial to adjudicate each claimant's situation. It will literally take years to resolve these individualized issues, which means the common issues do not predominate over the individual issues.

### 2. Superiority

Rule 23(b)(3) sets forth a non-exhaustive list of factors to consider in determining whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." One of these – "the likely difficulties in managing a class action" – is of particular relevance to this suit. "[T]his consideration encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 164 (1974).

The Court has already addressed the need to essentially conduct 5,000 individual trials. This requires inordinate amounts of preparation by the attorneys, and a degree of devotion to a single case that would be unprecedented for the Court. Most significantly, the feasibility of asking a single jury to sit and hear the entire case from beginning to end is simply impossible.[5] As the undersigned wrote in connection with a class less than half the size of the one Plaintiffs propose,

---

[5]Plaintiffs cannot suggest that different juries be empaneled because the jury that decides the case has to be the jury that heard and resolved the common issues – and if

11

> The Court is also concerned that forcing the plethora of individual issues into a class action constitutes a disservice to both potential class members and the Defendant. Given the number, magnitude and importance of the individual issues, certain class members' voices may be lost amidst the sheer number of fellow plaintiffs—each with different stories to tell. Conversely, the Defendant will be in a position where it has to prepare for nearly 2000 different trials simultaneously. Finally, neither party can seriously expect a jury's full attention and consideration for the length of such proceedings, nor can they expect evenhanded, consistent treatment from beginning to end.

Smith, 174 F.R.D. at 98. This does not mean that large classes are *per se* disallowed. The problem is the sheer number of individualized issues that must be resolved. There are 5,000 stories to tell, not one – and therein lies the difference between a permissible class action and what Plaintiffs propose.

Plaintiffs seemingly anticipate this problem by suggesting that the jury can simply determine whether Defendants are liable and award a sum necessary to compensate the class as whole. Class members can then file claims with the fund and thereby prove to a Special Master that they are entitled to an award from the fund and demonstrate the amount they are entitled to receive. This procedure is impossible for at least two reasons. First, as discussed above, liability and damages are highly individualized questions. Thus, the jury cannot ascertain liability or the extent of damages without considering the individual events involving each and every class member. Second, Defendants are entitled to a jury's resolution of all factual issues related to liability and damages.

Plaintiffs also suggest that a class action is a superior method of resolution because this is a negative value suit – that is, actual damages are likely to be less than the cost of bringing the suit. The Court is not convinced this is true, but if this is a negative value suit it is unlikely that each of the class members will submit to depositions and produce the witnesses necessary to establish facts attendant to their individual situations – which means certification does not advance any interests

---

Plaintiffs suggest this is not necessary, then Plaintiffs will have essentially confessed the common issues are not important and, hence, do not predominate over the individual issues.

whatsoever.  The Court is also not convinced that there is any "stigma" associated with bringing a suit such as this, much less that any such stigma is strong enough to be a factor favoring the superiority of certification.  Regardless, any factors that may suggest a class action is superior to other methods are dwarfed by the manageability concerns, so on balance certification is not a superior means of resolving these disputes.

### C.  Errata

Plaintiffs present a variety of arguments contending that discrimination and racism are evils that have effects beyond the immediate victims or targets.  The Court has no doubt this is true: society as a whole is diminished when discrimination occurs.  However, in presenting this argument, Plaintiffs do not explain how it advances any of the Rule 23 factors.  From a sociological perspective, the community as a whole may have been harmed; this observation does not mean that Plaintiffs can pursue legal claims on behalf of society as a whole, nor does it mean that the law permits a class to be certified.[6]  Plaintiffs also seem intent on putting Defendants on trial in the abstract for their wrongdoing, but this is not the object of litigation.  Plaintiffs may put Defendants on trial *for what Defendants did to Plaintiffs*.  Plaintiffs' arguments suggest to the Court that Plaintiffs may have lost sight of this distinction.

### III.  CONCLUSION

The Motion for Class Certification is denied.

IT IS SO ORDERED.

                                        /s/ Ortrie D. Smith
                                        ORTRIE D. SMITH, SENIOR JUDGE
DATE: February 3, 2015            UNITED STATES DISTRICT COURT

---

[6]It should be noted that the entire analysis would be different if Plaintiffs were seeking only injunctive relief and attempting to proceed under Rule 23(b)(1) or Rule 23(b)(2).  However, Plaintiffs are not pursuing this tactic.