IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

DANTE A.R. COMBS, individually and )
on behalf of all others similarly situated, )
and ADAM S. WILLIAMS, individually )
and on behalf of all others similarly )
situated, )
 )
               Plaintiffs, )
 )
vs. )     Case No. 14-0227-CV-W-ODS
 )
THE CORDISH COMPANIES, INC., )
et al., )
 )
               Defendants. )

<u>ORDER AND OPINION GRANTING
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>

      Plaintiffs' Amended Complaint asserted two counts. The Court dismissed Count
I without prejudice for lack of jurisdiction on August 26, 2014 (Doc. # 56). Count II
asserts violations of 42 U.S.C. § 1981 and is the subject of two Motions for Summary
Judgment. Both motions (Doc. # 204 and Doc. # 213) are granted, and judgment is
granted for all Defendants on Count II.

<u>I. BACKGROUND</u>

      The Amended Complaint names five defendants: Lounge KC, LLC,
Entertainment Concepts Investors, LLC, Entertainment Consulting International, LLC,
The Cordish Companies, Inc., and First Response, Inc. For ease of discussion, the first
four defendants will sometimes be referred to collectively as "the Cordish Defendants."
On several occasions the Court has commented on the lack of a clear explanation as to
how some of the Cordish Defendants are connected to Plaintiffs' claims. <u>E.g.</u>, Doc. #
56 at 1; Doc. # 121 at 1-2; Doc. # 144 at 5. Even now, in response to Defendants'

Motions for Summary Judgment, the connection between some Defendants and Plaintiffs' claims is unexplained and unestablished.

The Kansas City Power & Light District ("the District") is a multi-block neighborhood in downtown Kansas City, Missouri. The District began operations in late 2007 and is comprised of restaurants, bars, clubs, and other entertainment venues. In the center of the District is an enclosed space surrounded by bars, restaurants and nightclubs; this space is referred to variously by the public, patrons and others as the "Living Room" or "Plaza" area. Three businesses surrounding this area are Maker's Mark, the Mosaic Lounge, and Tengo Sed Cantina ("Tengo"). Maker's Mark is owned by Kentucky R&L, LLC, which is not a defendant in this action. The Mosaic Lounge is owned by Lounge KC, which is a defendant. Tengo's owner is Mexas KC LLC, but Mexas KC is not a Defendant. The Amended Complaint alleges The Cordish Companies "own, operate and/or lease all of the property located in the" District, Amended Complaint ("AC") ¶ 9, – but this allegation was denied in the Cordish Defendants' Answer and there has never been further discussion, elaboration, clarification, or proof on this matter. The Amended Complaint describes Entertainment Concepts and Entertainment Consulting as Maryland limited liability companies, AC ¶¶ 10-11, but does not allege any connection between them and the District, nor does it allege any connection between them and the events in question. Nothing Plaintiffs have filed subsequent to the Amended Complaint sheds much light on these matters.

Defendant First Response provided security in the District between December 31, 2010 and October 26, 2014, pursuant to a Protective Services Agreement it entered on December 4, 2010 with Kansas City Live, LLC. Kansas City Live is not a party to this suit. The Protective Services Agreement specifies First Response is an independent contractor and that the individuals providing security are not employees of Kansas City Live.

Plaintiffs' claims arise from three distinct incidents occurring in the District. Each is described below. In addition, facts surrounding Plaintiff Combs's personal bankruptcy are set forth.

2

## A.  Maker's Mark Incident

On August 26, 2010, Plaintiffs and a group of friends visited Maker's Mark for happy hour.  At some point in the evening Williams was approached by Cail Hendry, who was also at Maker's Mark with a group of friends.  Behind or near Hendry was a member of his group referred to as "John."  Behind or near Williams was Plaintiff Combs.  An altercation broke out after John grabbed Williams' finger.  Maker's Mark bouncers (who were employed by the restaurant and not the security company) surrounded the group, followed shortly by security guards.  Williams and Hendry were handcuffed and removed from the premises.  John was never handcuffed; neither was Combs or any of the other combatants.

Hendry was released after about fifteen or twenty minutes of questioning at the site.  Hendry Dep. at 180-83.  He then went back inside Maker's Mark, paid his bill, waited fifteen minutes, then left; he waited the fifteen minutes in order to avoid any possible encounter with Williams.  Hendry Dep. at 15-17.  Williams testified he was detained for around ninety minutes before being allowed back into Maker's Mark.  Williams Dep. at 121.  In his affidavit, Combs indicates Maker's Mark's bouncers told Williams he had to leave.  Combs Aff. (Plaintiffs' Ex. LL) page 3.[1]  Plaintiffs suggest Williams addresses this issue in his affidavit, which is denominated Exhibit AA, Doc. # 242 p. 21 – but there is no Exhibit AA.[2]  Plaintiffs also suggest this issue is addressed on page 230 of Williams's deposition and pages 418-19 of Combs's deposition, but

---

[1]Plaintiffs represent Combs's Affidavit as establishing that the security guards ejected them.  Doc. # 242 at 21.  This is not what Combs's Affidavit says, and this occasion represents just one of many circumstances in which Plaintiffs represent documents as saying something they do not.  The Court will not point out each and every such instance; instead, the Court will simply describe the Record as it actually is.  Plaintiffs also have a tendency to controvert facts with statements that are not contradictory, but rather attempts to add additional (and often immaterial) details in an attempt to "spin" or divert from the facts.

[2]The manner in which Plaintiffs have filed their exhibits supporting their response is . . . confusing.  In order, those exhibits are: A, B, C, D, E, G, H, I, J, JJ, KK, L, LL, M, N, NN, O (later deleted by Plaintiffs), OO, PP, Q, QQ, R, S, T, U, X, Y, Z, V, W.  See Doc. Nos. 242, 243, 244, 245, 246, 247, 251.  There is no index.

3

those pages say nothing about being told to leave the District (much less who gave the instruction).

Plaintiffs also repeatedly suggest Exhibits U and V provide further detail about how Williams was treated after he was handcuffed, but neither exhibit sheds much light. Exhibit U is the Incident Report prepared by a security officer. It indicates the incident (that is, the altercation itself) lasted for three minutes. It indicates Hendry and Williams were detained. It says that after investigation "it was determined that it was a mutual altercation and both males were compliant. Both parties were then released. After Mr. Hendry was released Mr. Williams wanted to press charges but KCPD Sgt. Satter explained the circumstances and Mr. Williams left with no further incidents." The Incident Report does not indicate anything more that might be relevant. Exhibit V is Glen Cusimano's deposition and declaration (with exhibits). Combined, Exhibit V spans 158 pages and Plaintiffs have not specified a page number for the Court to review. The Court is neither required nor inclined to read every page to find the reference to Williams. The Court has examined the deposition's index: the word "Williams" appears twice and the phrase "Maker's Mark" appears nine times. None of these references shed any light on this incident. Cusimano Dep. at 45, 47, 65-66, 79, 138, 241, 253, 273, 291, 322, 342. In fact, Cusimano testified that he did not know anything about what happened to Plaintiffs before filing his own lawsuit against The Cordish Companies and others, and denied knowing anything about the events of August 26, 2010. Cusimano Dep. at 65-66, 138.

Hendry was not employed by any of the Defendants. This fact is established by Hendry's testimony and is not contradicted by Plaintiffs' unsubstantiated theory that Hendry was a "rabbit" – a person paid by one or more of the Defendants to pick fights with African American patrons in order to provide an excuse for them to be ejected. Plaintiffs insist there is a controverted fact as to whether Hendry was a rabbit, but this is not the case. Given the importance of the "rabbit theory" to Plaintiffs' claims (and this claim in particular) the Court will discuss Plaintiff's evidence and theory here as part of the explanation as to why the Record conclusively establishes Hendry was not a rabbit.

Hendry was employed by the City of Olathe, Kansas, which is also where he lived. Hendry Dep. at 5-7. He testified he had never worked for any entity in the

District, either directly or indirectly. Hendry Dep. at 7-8. He rarely even goes to the District, Hendry Dep. at 206, but he was at the District that night with his girlfriend and some other friends to watch professional fights that were held that night for entertainment. Hendry Dep. at 8-9, 24. The group consisted of approximately ten people. Hendry Dep. at 138. At some point during the evening Hendry's girlfriend pointed out a man that had been staring at her; that man was Williams. Hendry Dep. at 12-13, 113-14. Hendry also observed Williams looking (or staring) at his girlfriend. Hendry Dep. at 117, 123-24. Whether Williams was or was not staring at Hendry's girlfriend is beside the point: Hendry thought he was, and that is why Hendry approached Williams. Hendry Dep. at 13, 151. Staring and conversing ensued until John "reached over and grabbed [Williams's] hand and his finger . . . [a]nd started to bend it back." Hendry Dep. at 14, see also Hendry Dep. at 152. 162. The fracas ensued, and security was eventually called. Hendry Dep. at 14, 163-64, 179-80. Hendry was not asked by anybody to pick a fight with other patrons. Hendry Dep. at 27.[3]

Plaintiff nonetheless insist that "[s]ubstantial evidence shows Hendry functioned as a 'rabbit' for the Cordish entities that night, to start trouble with Combs and Williams because they were African American, and thereby demonstrating 'intent to discriminate' on the part of the Cordish entities." Doc. # 242 at 9. At best, however, Plaintiffs have demonstrated a disputed issue of material fact as to whether rabbits were employed at the Mosaic Lounge, e.g., Cusimano Aff. ¶ 9-12; Martinez Dep. at 98; Alexitch Dep. at 20-24[4] – but they have not created a triable issue as to whether rabbits were employed

---

[3]Interestingly, Plaintiffs' counsel did not ask Hendry any questions reasonably designed to establish that Hendry was a rabbit or otherwise employed by or connected to any of the Defendants.

[4]Some, but not all of this material comes from depositions from other cases. The Cordish Defendants insist these depositions cannot be considered simply because they are from other cases – but the Court disagrees. It may be that they cannot be used as evidence at trial, but they are sworn statements that are at least the functional equivalent of affidavits that can be used under Rule 56. Just as with any other sworn statement, the Court must presume – for purposes of Rule 56 – that if called to testify at trial the deponents would testify consistently with their sworn deposition testimony, regardless of the case in which the deposition was taken. That testimony, if offered live

at Maker's Mark or, more importantly, that *Hendry* was a rabbit. Plaintiffs think they have created a triable issue by pointing to evidence demonstrating

- Hendry directed racial slurs toward Williams but made no physical contact, just like rabbits are instructed,
- Security arrived quickly,
- Security ignored those witnesses who said Williams had been attacked and instead removed him along with Hendry,
- Security never found or did anything to Hendry's friend, who is the one who actually initiated physical contact, and
- Hendry was released after questioning.

How this demonstrates Hendry was a rabbit employed by one or more Defendants to start fights with African Americans escapes the Court. These facts are barely consistent with Hendry being a rabbit and much more consistent with an ordinary bar fight – particularly in light of Hendry's uncontradicted testimony about why he was in the District. The most damning fact is that security may have "gotten the wrong man," but this fact is hardly remarkable and does not suggest Hendry was a rabbit.

Plaintiff also relies on Combs's declaration that the security guards and bouncers "made it clear they were intent on harming Adam Williams and . . . had nonverbal messages for us both as black men. The message was, 'We don't want you here, so we are . . . not going to pursue the men we know just attacked you, but instead we are going to accuse YOU of doing wrong, and beat up and harass you at least one of you, so you both get the message that you better leave and never come here again." Combs Aff. (Ex. LL) pages 2-3. This is not something anybody actually said; it was Combs's interpretation of events – which he does not describe in the affidavit. A witness can testify as to what he or she sees or hears, but cannot testify as to what someone else is thinking.

Viewed in the light most favorable to Plaintiffs, the evidence demonstrates Cusimano was ordered to use rabbits at the Mosaic Lounge. Nothing establishes that anyone at Maker's Mark was ordered to use rabbits or, critically, that Hendry was one.

---

at trial, must be admissible – but it is not rendered inadmissible simply because it was presented in a deposition in an unrelated case.

Plaintiffs suggest that Reed Cordish wanted as few African Americans in the District as possible.[5] They present Cordish as "the majority (or sole) owner of Defendant Entertainment Holdings LLC" – but Entertainment Holdings LLC is *not* a Defendant, and its connection to the events is not even discussed much less established. Reed Cordish is also identified as the "owner of Defendant ECI," but "ECI" is never further identified: it is not clear if "ECI" refers to Entertainment Concepts Investors, Entertainment Consulting International, both, or neither – so the Court cannot confirm which "ECI" is implicated, which one is not, or even if either is (which is particularly important given Plaintiffs' prior mischaracterization of Entertainment Holdings as a Defendant). Regardless, Plaintiffs have also failed to explain any connection between Cordish, "ECI" and anything that happened to the Plaintiffs on August 26, 2010. They cite pages 132, 133, 135 and 138 of Miller's deposition to establish this connection, but nothing on those pages connect him (or "ECI, which is also undefined in the deposition excerpts provided to the Court) to Maker's Mark.

Plaintiffs also point to the conduct of Jake Miller, purportedly a vice-president of the unclarified "ECI." Cusimano testified Miller was the one who told him to employ a rabbit. Plaintiffs represent that Miller also "controlled management of Maker's Mark in his position of ECI's President" and was known to use racial slurs as well. Doc. # 242 at 9. However, nothing Plaintiffs cite establishes that Miller had anything to do with Maker's Mark's management, that rabbits were employed at Maker's Mark or – most critically – that Hendry or anyone else involved in the August 26, 2010 incident was a rabbit.

The only way a jury could reach the factual conclusion Plaintiffs' claim depends on – that Hendry was a rabbit hired to pick a fight with African Americans – is to engage in rank speculation. Even if Hendry was a rabbit, there is nothing to indicate The Cordish Companies is involved in the hiring of rabbits. Even if the managers at Maker's Mark hired rabbits, there is no indication that Entertainment Concepts Investors or

---

[5]It is not clear that there is admissible evidence on this point. For instance, Christina Martinez testified "[i]t was a well known fact that" African American patrons were not wanted when Reed Cordish was present. Martinez Dep. at 26. Martinez presents no basis for this knowledge, and rumor and supposition is generally not admissible.

Entertainment Consulting International had anything to do with it. Even if Miller's actions with respect to Cusimano could be construed as some indication that he was involved in Maker's Mark's hiring of a rabbit, Plaintiffs have not clarified whether he was acting in connection with Entertainment Concepts Investors, Entertainment Consulting International, or someone else entirely – or that he similarly directed Maker's Mark to hire rabbits or that (again) Hendry was one. There are no issues of fact to be resolved, so there is nothing to present to a jury.

### B. Mosaic Lounge Incident

On an unspecified date in early summer of 2011, Combs attempted to enter the Mosaic Lounge. There was a line of people trying to get in, and Plaintiff got in the line. While in line he was asked for identification, which he provided. The people in front of Combs – who were Caucasian – were not asked for identification. Combs Dep. at 242, 248. Combs was removed from the line and asked to wait by the side; Combs questioned why this was happening and was told it was because his clothing was too baggy. Combs, however, was wearing a tailored suit and believed the explanation was suspect, so he asked to speak to the manager. These conversations took place with employees (including bouncers) at the Mosaic Lounge and became heated. E.g., Combs Dep. at 458-64, 471. During these conversations, a bouncer or other employee at the Mosiac Lounge told Plaintiff he was not going to be allowed in. E.g., Combs Dep. at 251, 462. Eventually, security arrived and "wanted to know what the problem was." Combs Dep. at 465-66. Combs told security that he was meeting friends in the Mosaic Lounge and the security guard told Combs he "just got involved into an altercation . . . . You know, we cannot have this. I think it's going to be safe, you know, for you to go ahead and leave the premises." Combs Dep. at 466, see also Combs Dep. at 468-69, 471. Combs protested, but he was escorted out of the District.

8

## C.  Tengo Incident

On July 6, 2011, Plaintiff contemplated going to Tengo because he believed some of his friends were already in the establishment.  He was not certain they were inside, however, so he stopped outside to text them.  Combs Dep. at 203.   He stopped approximately thirty feet from the front door to send the text.  Combs Dep. at 203, 294.  He was not actually in the line to gain entrance.  Combs Dep. at 203.  While he was engaged in this endeavor a person walked by and knocked Combs's cellphone out of his hand.  Whether he did this by bumping into Combs or by using his hand is neither clear nor important.  Thereafter, Combs and the other person "engaged [in] a heated conversation, potentially a brawl."  Combs Dep. at 207; see also Combs Dep. at 210.  Security arrived and escorted Combs out; he "thought [it] was unjust and unfair . . . that nobody wanted to listen to my story," which would have been that the other person was the aggressor and he (Combs) was blameless.  Combs Dep. at 207-08, 215-16.  According to Combs, the security guards walked him to the District's exit.  Combs Dep. at 210, 211-12.  Combs did not see the other person being walked out, but cannot say whether or not the other person was escorted out of the District.  R. at 220-21, 449.  Combs "doubt[s] if he was escorted out because [of] their energy and conversation around" him, and while he "was not a part of that conversation or in close proximity to hear exactly every single word that the security was having with the gentleman outside of Tengo's, . . . I can look at their nonverbals."  Combs Dep. at 480.

## D.  Combs's Bankruptcy

Combs agrees that at the time of each incident he believed that he had suffered discrimination.  He "consulted [with] friends who were lawyers after each one, [but] I didn't think filing a lawsuit was worth the trouble."  Combs Aff. (Ex. LL) page 2; see also Combs Dep. at 359.

On April 25, 2011, Combs filed a voluntary petition for bankruptcy relief under Chapter 7 of the Bankruptcy Code.[6]  The petition was filed in the District of Kansas. Schedule B to the Petition was filed the same day and required Combs to list all of his assets, including "other contingent and unliquidated claims of every nature."  Combs did not list any of his claims against Defendants.  In an affidavit, Combs says he did not know he had to list his contingent and unliquidated claims against Defendants on the form asking him to list his contingent and unliquidated claims.  He also explains that he "made a reasoned decision not to bring claims," which is apparently intended to explain either (1) why he did not have to list the claims or (2) why he should be excused from failing to do so.  Combs Aff. (Plaintiffs' Ex. QQ) page 1.  On August 31, 2011, the Bankruptcy Court discharged Combs's debts.

In 2014, Combs changed his mind about pursuing his claims after hearing media reports about other events in the District.  Combs Aff. (Plaintiffs' Ex. QQ) page 1.  He filed this suit on March 10, 2014.  In October 2014, the Cordish Defendants issued interrogatories; the second question asked Combs whether he had been "a party to" a variety of proceedings, including bankruptcies, within the last ten years.  On December 4, Plaintiff objected on a variety of grounds, suggested the information – if it existed – was in the public record so the Cordish Defendants could find the answer on their own, and declined to answer the question.[7]  The Record does not establish whether Plaintiffs' counsel asked Combs if he had ever filed for bankruptcy – and if she did, the Record also does not divulge whether (1) Combs provided incorrect information to counsel or (2) Combs divulged his bankruptcy to counsel.  During his deposition six days later, Combs was asked about stressors in his life; after identifying several he said "I think

_____

[6]In addition to the parties' agreement on many of the facts involving the bankruptcy, the Court can take judicial notice of other courts' records that relate to matters connected to this case.  E.g., Great Plains Trust Co. v. Union Pac. R.R. Co., 492 F.3d 986, 996-97 (8th Cir. 2007); Stutzka v. McCarville, 420 F.3d 757, 760 n.2 (8th Cir. 2005).  The Docket Number for the bankruptcy case in the District of Kansas is 11-21183.

[7]Plaintiffs' defend the decision not to respond, characterizing the question as "vague" and bearing "no relation" to the case.  Doc. # 242 at 37.  The Court rejects this characterization.

during that time I filed bankruptcy. That was a stressor, as it would be for anybody that has to go through that process." Combs Dep. (Exhibit N) at 47.

Meanwhile, on December 1, Plaintiffs filed a Motion for Class Certification in which Plaintiffs represented that both of them could adequately represent the class. However, Plaintiffs did not advise the Court that Combs was subject to a unique defense occasioned by his bankruptcy discharge, or that at that moment he did not have the right to pursue his claim because it belonged to the bankruptcy estate.

On April 10, 2015 the Cordish Defendants filed the pending Motion for Summary Judgment. Among the grounds for summary judgment presented by the Cordish Defendants were two arguments predicated on Combs's bankruptcy discharge: one predicated on lack of standing and one predicated on judicial estoppel. Ten days later, Combs initiated efforts to reopen his bankruptcy. In that motion, Combs represented – contrary to his deposition testimony in this case – that he was "unaware of the discriminatory actions by the Defendants . . . which constitute the basis of the claim . . . . Therefore, the claim was not listed on Schedule B of the Petition and Schedules." Bankr. Doc. # 25 at 1. At 10:01 on the evening of May 4 – the day his response to the Motion for Summary Judgment was due – Combs asked for an extension of time to May 20. The Cordish Defendants opposed the requested extension and in so doing pointed out the contradiction between Combs's deposition testimony (to the effect that he was aware he had been subjected to discrimination) and Combs's recent representation to the Bankruptcy Court (to the effect that he did not list his claims against the Defendants on Schedule B because he did not know he had any claims). The Court granted Plaintiffs' request for an extension but stated, among other things, that "Plaintiffs shall address the seeming inconsistencies in Plaintiffs' representations set forth by the Cordish Defendants on page 3 of Doc. # 225." Doc. # 228. Combs has not explained his contradictory statements; instead, he has attempted to justify them, arguing that the claim was "only omitted by pure 'inadvertent mistake,' due to Combs' personal belief prior to 2014, that the case wouldn't have value worth pursuing and because Combs had been warned that would be going 'up against a monster.' Combs decided to pursue his claims only after hearing the outrageous news reports in March [2014]." Doc. # 242 at 49.

A hearing was held in the Bankruptcy Court on June 5. On June 8, Combs filed a post-hearing document in which he reversed course again and represented that he "was not aware that he had any . . . 'unliquidated claims,' or 'causes of action at the time of filing [his bankruptcy petition] and he listed none." Bankr. Doc. # 37 at 1. Combs continues by explaining that while he knew or believed he had been the victim of discrimination, he nonetheless did not think he had a claim arising from the Maker's Mark incident because "(a) he didn't know who had masterminded the ordeal, (b) he didn't have the identities of the attacker(s), (c) he viewed the incident as a 'negative and upsetting experience' rather than a lawsuit to pursue." Bankr. Doc. # 37 at 2. The document does not specifically discuss the other two incidents or the reasons why Combs did not (or did not have to) disclose them to the Bankruptcy Court.

The Bankruptcy Court has not ruled on Combs's motion to reopen his bankruptcy.

## II. DISCUSSION

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See generally Williams v. City of St. Louis, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Wierman v. Casey's Gen. Stores, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588-89 (1986); Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985). However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the . . . pleadings, but

12

. . . by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Speculation, or a bare possibility that facts are as a plaintiff believes them to be, will not preclude summary judgment. "The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (quotations omitted).

## A. Combs's Claims and Judicial Estoppel

The Cordish Defendants contend Combs lacks standing to assert his claims because his claims belong to the bankruptcy estate. They alternatively contend Combs should be judicially estopped from asserting his claim, based on his inconsistent positions in this Court and the Bankruptcy Court. The Court agrees that judicial estoppel applies and for that reason declines to address the issue of standing.[8]

As an initial matter, the Court notes this issue was not raised by First Response. Nonetheless, the Court concludes judicial estoppel can be raised by the Court to bar Combs's claims against all Defendants. While the Eighth Circuit has not specifically stated so, other circuits have held judicial estoppel may be raised sua sponte. "[J]udicial estoppel . . . can be raised by courts *sua sponte* because judicial estoppel concerns the integrity of the judicial system independent of the interest of the parties." In re Airadigm Communications, Inc., 616 F.3d 642, 661 n.14 (7th Cir. 2010); see also

---

[8]The Court declines to address the standing issue because any discussion could be greatly affected (if not rendered irrelevant) if the Bankruptcy Court grants Combs's pending motion to reopen his bankruptcy. The standing issue would not be completely resolved by the reopening of the case because if that happens it will be the Bankruptcy Trustee and not Combs who can bring the suit. It may be that the Bankruptcy Trustee will abandon the claim; the Bankruptcy Trustee might also permit Combs's current counsel to continue prosecuting Combs's claims on behalf of the estate. In contrast, judicial estoppel does not depend on the outcomes of these contingencies.

Case 4:14-cv-00227-ODS   Document 269   Filed 06/15/15   Page 13 of 23

Kaiser v. Bowlen, 455 F.3d 1197, 1204 (10th Cir. 2006); Grigson v. Creative Artists Agency LLC, 210 F.3d 524, 530 (5th Cir.), cert. denied, 531 U.S. 1013 (2000); DeMarco v. Ohio Deocrative Products, Inc., 19 F.3d 1432 (6th Cir. 1994) (unpublished opinon); Mathison v. Berkebile, 988 F. Supp. 2d 1091, 1102-03 (D.S.D. 2013).  The judiciary's independent interest in the integrity of its proceedings transcends the parties and justifies considering the issue with respect to all of Combs's claims.

The following factors are to be considered when determining whether a party is judicially estopped from taking a particular position:

1. Whether the party's current position is clearly inconsistent with its prior position,

2. Whether the party successfully persuaded the court to accept its original position such that it would "create the perception that either the first or the second court was misled," and

3. Whether the party asserting the inconsistent position would derive an unfair advantage if not estopped.

Schaffart v. ONEOK, Inc., 686 F.3d 461, 469 (8th Cir. 2012) (citing Gray v. City of Valley Park, Mo., 567 F.3d 976, 981 (8th Cir. 2009)); see also New Hampshire v. Maine, 532 U.S. 742, 750 (2001).  The use of judicial estoppel is particularly appropriate when a plaintiff fails to divulge the claim when previously seeking bankruptcy protection.  "In the bankruptcy context, a party may be judicially estopped from asserting a cause of action not raised in a reorganization plan or otherwise mentioned in the debtor's schedules or disclosure statements."  Stallings v. Hussmann Corp., 447 F.3d 1041, 1047 (8th Cir. 2006).

Combs was obligated to divulge all of his assets because his assets (less exempt property) belonged to the bankruptcy estate.  11 U.S.C. § 521(a)(1).  Bankruptcy estate property "includes property acquired during the pendency" of the bankruptcy case, Education Assistance Corp. v. Zellner, 827 F.2d 1222, 1224 (8th Cir. 2001); see also 11 U.S.C. § 1306(a)(1), and a bankruptcy debtor has a continuing obligation to "amend his financial statements if circumstances change."  Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1286 (11th Cir. 2002); see also Stallings, 447 F.3d at 1049.  Schedule B to Combs's bankruptcy petition required a listing of personal property, and certain categories of personal property were listed and described.  Item 21 required Combs to

14

list "[o]ther contingent and unliquidated claims of every nature," and in response Combs checked a box indicating "None." "A debtor's failure to list a claim in the mandatory bankruptcy filings is tantamount to a representation that no such claim existed." Stallings, 447 F.3d at 1047 (quotations and citation omitted). The second factor is satisfied because the Bankruptcy Court relied on Combs's representations and discharged his debts. Cf. id. at 1048; see also Guay v. Burack, 677 F.3d 10, 18 (1st Cir. 2012).

Under the final factor, "the debtor's non-disclosure of the claim must not be inadvertent and must result in the debtor gaining an unfair advantage." Stallings, 447 F.3d at 1048. Combs occasionally describes his failure to disclose his bankruptcy as "inadvertent," but his explanations render that label inapt. Moreover, Combs's inconsistent positions bely his inadvertence and suggests either obfuscation of, or apathy toward, his inconsistent representations. The following timeline makes clear Combs's inconsistencies and further demonstrates the lack of inadvertence:

- April 25, 2011 – Combs fails to list his claims against Defendants on his Schedule B.
- August 31, 2011 – The Bankruptcy Court issues a discharge.
- March 10, 2014 – Plaintiffs file this lawsuit.
- October 23, 2014 – The Cordish Defendants issue an Interrogatory asking Combs to identify any prior bankruptcies to which he is a party.
- December 1, 2014 – Combs files motion asking the Court to certify a class and designate him as a class representative without disclosing the existence of his bankruptcy even though a multitude of courts have held the existence of unique defenses is an issue to be considered when evaluating typicality or adequacy under Rule 23(a). In re Milk Prods. Antitrust Litig., 195 F.3d 430, 437 (8th Cir. 1999), cert. denied, 529 U.S. 2000); see also Ellis v. Costco Wholesale Corp., 657 F.3d 970, 984 (9th Cir. 2011); Beck v. Maximus, Inc., 457 F.3d 291, 300 (3d Cir. 2006); Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990), cert. denied, 498 U.S. 1025 (1991).
- December 4, 2014 – Combs objects to the Interrogatory and declines to answer.

15

- December 10, 2014 – During his deposition Combs makes a passing reference to having filed a personal bankruptcy.
- December 10, 2014 – During that same deposition, Combs admitted that he believed he had been subjected to discrimination at the time of each of the three incidents and that after each one he "immediately" consulted with friends who were lawyers. Some of the friends/lawyers advised him to proceed while others said not to waste his time because the Defendants would be formidable opponents in a lawsuit.
- April 10, 2015 – The Cordish Defendants file their Motion for Summary Judgment.
- April 20, 2015 – Combs seeks to reopen his bankruptcy case, contradicting his deposition testimony and telling the Bankruptcy Court that he was "unaware of the discriminatory actions by" the Defendants in this suit.
- May 1, 2015 – Combs completes an affidavit in which he avers that it "never occurred" to him that his claims against Defendants were assets and that he "certainly did not consider them such." In the very next sentence, he admits the claims that existed but he "had made a reasoned decision" not to pursue them, indicating that he knew the claims existed – otherwise, he could not have made a "reasoned decision" not to pursue them. He then explains he heard news reports in 2014 about rabbits in the District and this changed his view toward his own claims.
- May 21, 2015 – Combs responds to the Motion for Summary Judgment, contending he omitted the claims from his bankruptcy schedules because he thought they lacked value due to the difficulty in pursuing them.
- June 8, 2015 – In a post-hearing Brief filed with the Bankruptcy Court, Combs argues that he "was not aware that he had any . . . 'unliquidated claims'", or 'causes of action'" at the time of filing, and he listed none." Later in that same document, Combs explains that while he "believed the incident[s] had been driven by race . . . he never considered filing a lawsuit because "(a) he didn't know who had masterminded the ordeal, (b) he didn't have the identities of the

attacker(s), (c) he viewed the incident as a 'negative and upsetting experience' rather than a lawsuit to pursue."

Combs has made contradictory statements about the reason for not including the claims in his Schedule B. He has conceded he knew about his claims at the time of his bankruptcy. He has also made a few statements (occasionally in the same breath) declaring that he did not know he had claims. The contradictions are puzzling and a cause for concern.

Combs has not suggested he did not understand Schedule B sought information about the claims. He seems to argue that he did not have to disclose the claims because he decided not to pursue them – but of course, having filed for bankruptcy, it was not his decision whether to pursue the claims, nor was it his decision to disclose some of his assets and not others. The Schedule B was clear – it required him to disclose "contingent and unliquidated claims of every nature," and he was required to do this so the Bankruptcy Trustee could decide what to do with the claims. The fact that Combs did not want to pursue the claims did not mean he could fail to disclose them to the Bankruptcy Court.

In any event, what Combs has described is not inadvertence. It is clear that he knew he had the claims, and their omission from Schedule B was not inadvertent. Rather, by his own admission, Combs did not disclose them because he did not think they had any value – until, of course, more than two years later when he decided they actually had value and that he would pursue them on his own. At that point, his purported reason for not including them on the Schedule B – a perceived lack of value – was no longer true, yet Combs did not take any action to rectify matters in his bankruptcy case. When asked in an Interrogatory about the bankruptcy in October 2014, Combs did not take any action to rectify matters in his bankruptcy case. In December 2014, Combs responded to the Interrogatory in a manner that failed to divulge the bankruptcy case's existence. Also in December 2014, Combs represented to this Court that his claims were typical of all other members of the proposed class and that he could adequately represent the class, but failed to mention the bankruptcy – which is a concern because the existence of the bankruptcy discharge constituted a significant and well-recognized basis for undercutting these contentions.

17

Combs makes much of his stray remark in his December deposition in which he made a passing reference about his bankruptcy. This passing remark did not fully disclose the details about his bankruptcy. More importantly: even with this supposed "disclosure" Combs still did not take any action to rectify matters in his bankruptcy case. Combs did nothing until after The Cordish Defendants raised the issue four months later in the Motion for Summary Judgment. This sequence of events cannot be characterized as inadvertent. "'A debtor's failure to satisfy its statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment.'" Stallings, 447 F.3d at 1048 (quoting In re Coastal Plains, Inc., 179 F.3d 197, 210 (5th Cir. 1999) (emphasis in original)). Combs admits knowledge of the claims, and has a motive for concealing them; namely, an effort to collect the judgment that otherwise would have gone to his creditors. The inconsistencies in his conduct and statements augment the Court's conclusion that the third factor has been satisfied.

Combs argues there has been no prejudice to Defendants, and argues they should not receive a windfall. The argument misapprehends the interests at issue. Judicial estoppel is not invoked in this context because of prejudice to the defendants in the post-bankruptcy suit. "[W]hen a debtor does not disclose potential claims against its creditors in the bankruptcy petition, the interests of both the creditors and the bankruptcy court are impaired." Stallings, 447 F.3d at 1048. The Court's view would not change even if the Bankruptcy Court reopened Combs's bankruptcy. Permitting a plaintiff to "back-up, re-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, suggests that a debtor should consider disclosing assets only if he is caught concealing them." Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1288 (11th Cir. 2002). As the Fifth Circuit held, "Judicial estoppel was designed to prevent such abuses." In re Superior Crewboats, Inc., 374 F.3d 330, 336 (5th Cir. 2004). "A doctrine that induces debtors to be truthful in their bankruptcy filings will assist creditors in the long run (though it will do them no good in the particular case)-and it will assist most debtors too, for the few debtors who scam their creditors drive up interest rates and injure the more numerous honest

18

borrowers." Cannon-Stokes v. Potter, 453 F.3d 446, 448 (7th Cir.), cert. denied, 549 U.S. 1099 (2006).

In the particular circumstances of this suit the interests of this Court have also been impaired, both in terms of its consideration of the Motion for Class Certification and the impact Combs's actions have on the trial schedule. Combs's bankruptcy should have been revealed to the Court when Combs represented that he was a typical member of the class he proposed and that he could adequately represent the class's interests. As noted earlier, even if the Bankruptcy Court reopens the case it will be the Bankruptcy Trustee, not Combs, who can prosecute these claims. The Bankruptcy Trustee has had nothing to do with this case, and it is unknown (but doubtful) whether the Bankruptcy Trustee can be ready for trial in early August. It may be that the Bankruptcy Trustee abandons the claims[9] or allows Combs (with current counsel) to prosecute the case on behalf of the bankruptcy estate, but that contingency will not be answered until the contingency regarding the reopening of the case is resolved – and even then, it may be that both contingencies will not be resolved quickly enough to retain the trial setting. This circumstance is entirely the product of Combs's failure to address this issue until after it was raised in a dispositive motion.

Combs is judicially estopped from asserting claims that he had before he filed for bankruptcy relief, as well as claims that arose while his bankruptcy was pending and before he was granted a discharge of his debts. Judgment in favor of Defendants on all of Combs's claims is appropriate for this reason alone, regardless of the merits of his claims.

### B. The Maker's Mark Incident

Section 1981 declares that all persons in the United States "shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Congress defined the phrase "make and enforce contracts" to "include[ ] the making, performance, modification, and termination of contracts, and the enjoyment of

---

[9]If that is the Bankruptcy Trustee's decision, one wonders if it is the same decision that would have been made if Combs's claims had been revealed when the bankruptcy was pending. If not, this constitutes an unfair advantage to Combs at the expense of his creditors.

all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b).  A claim under this statute has four elements: "(1) membership in a protected class, (2) discriminatory intent on the part of the defendant, (3) engagement in a protected activity, and (4) interference with that activity by the defendant." Gregory v. Dillard's, Inc., 565 F.3d 464, 469 (8th Cir.) (en banc), cert. denied, 558 U.S. 1025 (2009).  "The statute protects the would-be contractor along with those who already have made contracts and it thus applies to discrimination that blocks the creation of a contractual relationship that does not yet exist." Id. (quotations omitted

There is little question that Plaintiffs are members of a protected class, and were engaged in a protected activity.  Their claims founder on the fourth and, to a lesser extent, the second elements.

First Response was not the security company in August 2010 and had no role in the Maker's Mark incident.  This fact is so clear that Plaintiffs even agree with this fact. First Response is entitled to summary judgment.

The undisputed facts demonstrate Williams was ejected because he was involved in a bar fight/altercation and not because of his race.  Plaintiffs' efforts to suggest the fight was started at The Cordish Defendants' behest because of Williams's race are not supported by any evidence in the Record.  As stated earlier, Plaintiffs speculate Hendry was a rabbit hired by The Cordish Defendants or at their direction to start fights with African-American patrons – but there is no evidence that would permit the jury to reach this finding.  Without evidence, there is no triable issue. Torgerson, 643 F.3d at 1042.

Williams's claim also fails to the extent that he complains he was treated differently than Hendry.  He complains the security guards treated him differently either because they held him longer than Hendry or told him to leave the District, but even if there is evidence to support these claims the fact remains that Plaintiffs did not sue the security company involved.  The security company's actions cannot be attributed to The Cordish Defendants because there is no evidence The Cordish Defendants hired the security company – the only evidence remotely close to this issue establishes First Response contracted with Kansas City Live, who is not a defendant.  Regardless,

Plaintiffs do not advance this theory.[10]  Williams also complains that he was ejected and Hendry was not – but the only evidence on this point came from Combs, who said Maker's Mark's bouncers ejected Williams – and Maker's Mark is not a party.  Even if the security guards ejected Williams from the District, there is still no evidence making these Defendants legally responsible.[11]

## B.  Mosaic Lounge Incident

Combs's claim arising from the Mosiac Lounge incident is barred by judicial estoppel.  Even if it were not, summary judgment would be granted with respect to most of the Defendants.  There are disputed issues of material fact that would otherwise preclude summary judgment on Combs's claim against Lounge KC (owner of the Mosaic Lounge).  However, Combs has not demonstrated the existence of a disputed fact that might give rise to liability as to the other Defendants.

The undisputed facts reveal no connection between Combs's refusal of admittance and The Cordish Companies, Entertainment Holdings, or Entertainment Concepts.  Plaintiff has not identified any basis for holding these Defendants liable for what happened at the Mosaic Lounge, and they are entitled to judgment as a matter of law.

The Court concludes there is at least a disputed issue of material fact as to whether First Response was the security company that escorted Combs away from the Mosaic Lounge.  The Court says "at least" because the Record is pretty clear (but not

---

[10]It may also be that the security company was an independent contractor, which means the party contracting with the security company would not be liable for the security company's actions in any event.

[11]Combs's claim regarding the Maker's Mark incident also suffers because there is no evidence *anybody* interfered with his enjoyment of contractual rights.  Nobody told Combs he had to leave; nobody picked a fight with Combs; nobody handcuffed Combs.  Combs has suggested he left because of what happened to Williams – but he has not suggested that anybody (let alone The Cordish Defendants), interfered with his right to enter into or enjoy the benefits of contracts.  The Court need not delve into this matter, however, because the Record establishes Combs's claim fails for the same reasons Williams's claim fails and also because Combs is judicially estopped from asserting any of his claims.

21

conclusive) that the event occurred in 2011, which was after First Response and Kansas City Live entered the Protective Services Agreement. However, the undisputed facts demonstrate that it was employees of the Mosaic Lounge who declined to admit Combs, and that decision had been made and communicated to Combs before any security guards arrived. This means First Response did not interfere with Plaintiff's ability to contract with the Mosaic Lounge; if anybody interfered, it was the Mosaic Lounge. Again – but for the fact that Combs is judicially estopped from asserting his claims, this claim against Lounge KC would survive summary judgment.

### C. The Incident Outside of Tengo

Combs's claim arising from the incident outside of Tengo incident is barred by judicial estoppel, but even if it were not summary judgment would be warranted. First, the undisputed facts demonstrate Combs was not engaged in a protected activity. He strives mightily to suggest his opportunity to contract with Tengo was interfered with – but he was not even trying to enter the establishment. In fact, he had not even determined that he was going to enter the establishment – he was calling his friends to confirm they were in Tengo, and was not in line to enter. "To show protected activity, the third element [of a section 1981 claim], a plaintiff alleging interference with the creation of a contractual relationship in the retail context must demonstrate that he or she actively sought to enter into a contract with the retailer, and made a tangible attempt to contract." Gregory, 565 F.3d at 470. Standing in line to enter the Mosaic Lounge satisfies the third element; standing outside and some distance from the line to enter Tengo while trying to decide whether or not to enter does not. Section 1981 is not a general "anti-discrimination" statute, Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851, 855 (8th Cir. 2001), and allowing Combs to pursue a claim because he possessed a contingent possibility of entering the establishment violates this restriction.

Second, even if Combs was engaged in protected activity, there is no triable issue as to whether Defendants interfered with his ability to contract. There is no evidence – only Combs's speculation – that the unidentified person who caused him to drop his cellphone was a rabbit. Even if that person was a rabbit, there is no evidence –

only Combs's speculation – that any of the Defendants had anything to do with the hiring of the rabbit.[12]

III.  CONCLUSION

For the reasons outlined above, judgment is entered on Count II in favor of all Defendants.


IT IS SO ORDERED.

/s/ Ortrie D. Smith<br>
ORTRIE D. SMITH, SENIOR JUDGE<br>

DATE: June 15, 2015                    UNITED STATES DISTRICT COURT

---

[12]Combs does not clearly contend First Response should be held liable because the security guards treated him differently than the other person, but if he had the Record still would not present a triable issue.  He does not know if the other person was required to leave and only "doubts" that he was.  Combs only surmises the other person was treated better based on the guards' nonverbal actions – but Combs also admitted he was arguing with the security guards, which may have accounted for any differences in the guards' reactions.  The Court also notes that none of The Cordish Defendants contracted with First Response, so even if First Response is liable (and the Court holds it is not based on this Record), then that liability would not extend to The Cordish Defendants.

23